The first case is United States v. William Sculley. Good morning, Your Honors. May it please the Court. My name is Scott Resnick. I represent the defendant-appellant, Mr. William Sculley, in this matter. I've requested two minutes of rebuttal time. Your Honors, in our submissions to this Court, we have identified a number of grounds on which Mr. Sculley's conviction should be vacated. I'd like to use the time I have to focus on what I think is the most pivotal issue before us, which is the advice of counsel issue. This appeal is about a defendant's constitutional right to testify fully in his own defense at trial. That right was denied to Mr. Sculley when the District Court refused to allow him to testify as to advice he received from one of his attorneys as part of his good-faith reliance on counsel defense at trial. The decision to bar this testimony? He could have called attorney to mayo, couldn't he have? Your Honor, he . . . that is . . . The judge said he was in the courthouse all the time. Sure. The question right became, you know, you could have called attorney to mayo. I submit that that is a false flag for the issue that's before this Court. Mr. Sculley had a constitutional right to testify in his own defense whether he called anybody. He was not required to call anybody, and the advice and the testimony that he was prepared to give, he was fully competent to give. What is in the record about what kind of offer of proof as to what Mr. Sculley was actually planning to testify about? Because I had trouble identifying that. Sure. The evidence in the record, you know, regards here documentary evidence about his communications with Mr. Tameo. Well, the documentary . . . the documents are before us, but they are not very promising for the defense. A lot of that material is after the fact. It's advocacy. It's what Mr. Tameo was planning to say to the government, not what Mr. Tameo had said in advance to Mr. Sculley by way of legal advice, right? You're correct, Your Honor. There was . . . you know, based on the Court's ruling, we did not have the ability to put forward any of the evidence into the record. Well, wait, wait, wait, wait. No, you did. You had the opportunity. You or your predecessor counsel, I don't know who was representing him at the time, had the ability to make an offer of proof to the district court to explain what Mr. Sculley was going to say and what documents he would have introduced. The trouble I had . . . and it's relevant to your case. I don't know that it's controlling. It's something that I had trouble with. There was an answer, which was a very broad, general, Mr. Tameo blessed everything statement. I didn't find anything, now maybe I'm missing it, that laid out what Sculley told Tameo, what Tameo told Sculley in return, when and how that happened, what all the circumstances were. Now, you could say the district judge cut it off at the pass, but is there anything by way of offer of proof or anything else that explains in detail what Mr. Sculley planned to say? I think the closest that we could get to that, Your Honor, is we did have a pretrial hearing in which the government had moved in limine to preclude the advice of counsel defense. In the course of that proceeding, granted largely by the way of proffer and argument from the lawyers, was the issue as to why the advice of counsel should be allowed to be presented to the jury. I understand. So tell me what in that hearing was said about what Mr. Sculley told Tameo and what Tameo told Sculley that would be more than a cumulative, vague, Tameo blessed this, which is the statement that he made that led to the government's objection as far as I can see. And, you know, Your Honor, you know, you're correct. I cannot point to sort of specific, you know, to a specific detailed proffer. That certainly would have been beneficial, but there was discussion about Mr. Tameo was hired as, and was made clear at the hearing and also, you know, at parts of the trial, that he was Mr. Sculley's personal attorney. He was an individual who had different expertise than Mr. Gertler, the corporate attorney who testified. Didn't you argue specifically to the FDA he had expertise, Mr. Tameo? I'm sorry, I didn't hear the first part of the question, Your Honor. Didn't you argue that he had specific expertise about the FDA? Correct. He had specific expertise as to the FDA. He was a former assistant United States attorney. He was also our client's personal attorney, which I think is incredibly significant here in looking at, you know, arguments as to whether the information would have been cumulative or otherwise. Well, that all depends on what the information is, which I'm still not hearing. That is to say, it seems to me it's a very different matter to say Mr. Sculley was prevented from testifying, that he gave a full description of everything to do with his business to Mr. Tameo. And Mr. Tameo returned to him with some detailed analysis of that situation and said at the end of it that I think what you're doing is perfectly legal. There is a document that says Mr. Tameo was retained with that in mind. But then there is conspicuously not a written opinion or anything of the sort from Mr. Tameo that explains what his analysis was and what advice he gave based on what facts. And maybe Mr. Sculley could have testified orally to all of that. But I think it's a very different thing to say the judge excluded one sentence of I want to tell the jury that Mr. Tameo said everything was great versus the judge excluded testimony that would have established an advice of counsel defense. Well, certainly, Your Honor, what Mr. Sculley was prepared to testify was to the length of the relationship that he had with Mr. Tameo. Again, it was not a sort of a one-time, one-contact advice seeking. And I believe at the pre-trial hearing, the fact that Mr. Tameo participated with Mr. was lawful. Well, but the Gertler analysis was before the court and before the jury, and there would have been, was there testimony from Gertler that Tameo had participated in rendering the advice that Gertler gave? Well, all that got into the record at trial, Your Honor, before it was cut off, was that Tameo was working with Gertler. But what was conspicuously silent throughout the entire trial, and which created enormous prejudice from our side, was while the jury heard that Tameo was present, they never heard what Tameo had to say. But the question is, how can we find prejudice if we don't have an adequate proffer? Or are you saying we don't need to find prejudice? It's so bad that even though we don't have a good proffer, we should reverse just on the possibility that something prejudicial to the government would have come out? Well, Your Honor, I believe that this court can reverse without a proffer of the proof, just based on the concept that Mr. Scully was fully competent to give testimony as to his state of mind. Under the Fifth and Sixth Amendments of the United States Constitution, he was fully competent to give that testimony. That testimony was not hearsay. Well, and he would have been fully competent, certainly, to testify to a conversation, an oral conversation he had. And the government would have been free to attack it, even without Tameo, on the theory that what lawyer would give this kind of advice orally, casually. But that's another matter. Scully would have been fully competent to say, here's what I told Tameo, here's what Tameo told me. But if what the judge excluded was simply a one-sentence bottom line, I knew this guy a long time, and he said it was okay, not only do we have a different analysis of the prejudice of that ruling, it seems to me we also have a different analysis of whether that testimony is, indeed, as the judge said, a kind of blow-by that wouldn't actually establish anything. Well, certainly, Your Honor, that is not what was at stake here. This was not a one-contact advice, everything was fine. How do we know that? Well, the problem here is that we were not able to get that in front of the court, because every attempt to put in the supporting documentation or testimony was through the court. You made a motion supported by affidavits and supported by legal analysis to get the judge to change his mind. In my courtroom, that always was the kind of thing that I expected to see a proffer. Here's what is at stake. Here's the evidence that we're offering, and that's why this evidence that we're planning to offer is relevant. You have an opportunity to do that. And that argument we made in large part at the pretrial conference, you know, when we were defending our ability to put this evidence. I'm not familiar with that transcript to tell me what was said there that supplies the lack that came at the trial, and I still haven't heard that there was any kind of actual proffer. I'm not asking you for testimony from Scully. I'm asking you for a lawyer's proffer. What was the proffer? Sure. The proffer in this case was that Mr. Tamayo was a lawyer who brought specific FDA compliance expertise. He worked with Mr. Scully through the duration of his business. Mr. Scully brought all of his issues and problems to both Mr. Gertler and to Mr. Tamayo. Mr. Tamayo supported and agreed that the conduct, both with regards to how he was dealing with his company, with regards to what he was representing to the clients, was all lawful. And that was the, you know, part of the key part of the defense here. And that was put forward and argued vigorously, you know, pre-trial, the importance of Mr. Tamayo's testimony or expected testimony, and the fact that he also provided expertise that Mr. Gertler did not have, such that when the government argued in closing arguments that Mr. Gertler didn't have sufficient expertise, what was kept from the jury was the fact that there was another attorney who provided this expertise, but we were prevented from getting that in. Is the missing prop for them that Tamayo didn't say no? I mean, Scully would have testified, well, I was never told no by Tamayo, and therefore, that's the prejudice? No. What would have been . . . the testimony in this case would have been a, you know, multi-year relationship where Mr. Scully went to his attorneys at multiple occasions throughout the entirety of the business. They told him . . . these products from Europe where they were authentic drugs. You could sell them here in their authentic European packaging, notwithstanding . . . Your client was going to testify that Tamayo told him that? Yeah, that he told him that, that they had e-mails supporting that, that Mr. Tamayo was part of . . . Tell me about the e-mails, because I've seen the e-mails, and they don't support that. So point to one of the e-mails or tell me about some . . . there are e-mails that you didn't present in your proffer? Well, we've . . . the e-mails . . . we did not present specific e-mails in the proffer at the pre-trial hearing. Well, wherever you presented them, is there in the record anything beyond the documents that I have seen that are in the appendix in this case? The appendix in this case are . . . Those are the documents? Those are the documents. And is . . . can you point me to any e-mail that is not something that describes what Mr. Tamayo argued to the FDA after the search warrant, but describes in detail the kind of advice that you're saying was given at an earlier stage of the proceeding when the business was in full flower? Yes, Your Honor. What we have in our appendix at A439, Exhibit A-Y, which was not admitted into evidence, is a letter that Mr. Tamayo is reviewing and approving to send out to one of Mr. Scully's clients, the Sierra Nevada Cancer Center. Okay, so that's something I should look at is A439. Correct. But you see the difference between Mr. Tamayo as advisor, which is relevant to state of mind, and Mr. Tamayo as advocate saying to Mr. Scully, here's what I'm going to tell them. That doesn't mean that's what he was actually telling Mr. Scully. But, Your Honor, and I would direct you to A374.6 also, which is Tamayo's draft opinion as to the lawfulness of the business model, which we've included in our papers. Again, showing and going directly to your point, Your Honor, which is fair, is that Tamayo was advising . . . for me to provide you with a legal opinion. I have drafted an agreement for me to provide an opinion regarding criminal violations. There is nothing on that page in the nature of an opinion that actually was provided. I apologize, Your Honor. I cited the wrong page in our appendix. Perhaps you can share it with us when you take the podium again for rebuttal. I appreciate that, Your Honor. I appreciate that. So, in conclusion? In conclusion, Your Honors, the district court's decision not to allow Mr. Scully to testify to his advice of counsel defense was improper. The testimony he was going to give was not hearsay. It was classic state-of-mind evidence, nor was it unduly prejudicial to the government. The fact that Mr. Tamayo was not called to testify, had they wanted to, they could have called him themselves, and nor is it cumulative. And I think it's interesting just to note that in the government's papers, they back away from the unduly prejudiced argument, which was made in court, now to try to resurrect this decision by saying that it was unduly cumulative. That argument is without legs, as the attorneys in this case had different expertise. They had different clients. They had meetings with Mr. Scully that the other ones were not a part of. And the evidence that two lawyers from two separate fields both looked at this and gave him the advice that they thought it was legal had a huge impact on his state-of-mind. And the idea that this could be cumulative, yet cured by Mr. Tamayo testifying, is counter-logical. If the government and the court felt that the information was cumulative, to have Mr. Scully testify to this advice, strange that somehow you would cure that cumulativeness by calling another witness. So again, constitutionally, this was evidence that he was entitled to testify to. And the court's struggle to find a rationale to support excluding it is unpersuasive and improper. All right, thank you. Thank you. You're reserved two minutes for rebuttal. Good morning. May it please the court, my name is Kenneth Abel. I'm an Assistant United States Attorney for the Eastern District of New York. I'm here on behalf of the United States. Can I have a follow-up on some questions that Judge Lynch was asking? Of course, Your Honor. Originally, the judge thought that this was hearsay, talking about what Mr. Tamayo told Mr. Scully. But he changed his view of the reason for not allowing that testimony in early on or the next morning, and said it was a balancing under 403, and the government suffered prejudice. Well, the government could have cured this by calling Mr. Tamayo, who I assume you know as well. We are aware of Mr. Tamayo. That's correct, Your Honor. And you're also correct that the judge initially . . . Judge Spak gave a lot of thought to this ruling, as you can tell from his post-trial decision and during trial itself. He initially viewed it as hearsay. He's a good judge. He thought about it more. He got some briefing, and he changed his mind on that. And you agree with him now, right, that that is not hearsay? That's correct, Your Honor. But it's still completely appropriate. And, in fact, he was obligated to weigh that evidence under 403, as the court has made clear. So tell us why there is something prejudicial to the government about allowing a witness to testify about a conversation in which he participated that bears on his state of mind. Your Honor, you touched on it in your questions to opposing counsel. The testimony that prompted the objection from the government was, Mr. Tamayo told me my business was completely illegal. That statement, without a proffer, without any offer of proof prior to that, it's a very difficult thing for the government to respond to. Wait a minute. Look at pages A396 to 397 of the record, which is an email from Tamayo, presumably to Mr. Scully, with a draft statement of facts, and the email says, this is the statement of facts for the opinion letter. We're going to orally discuss this. Isn't there an inference of the proffer to be drawn from those documents that Tamayo was, in fact, prepared to give an opinion letter blessing the transaction? It may have never happened, but he's looking at the facts and he's saying, this is the draft for the opinion letter. The opinion letter wasn't going to say, it's not okay. Your Honor, yes, we had bits and pieces, we had fragments of what Tamayo was likely to say, but I just want the court to be aware, the timing of this document is important for one reason. This was circulated after Mr. Scully was approached by a client, a potential lucrative client who had concerns about the legality of his business. He was already selling these drugs at the time . . . That's an excellent point for cross-examination. It really is. It diminishes the opinion, but at least as to the continuation of an ongoing crime, it might give the defendant some protection. I don't think . . . I think this court has been clear the advice of counsel defense does not apply when the criminal activity has already commenced before a defendant seeks an opinion. That's a CYA type of measure. This was a situation where . . . For a case that says that, you have to hire the attorney on which you want to rely from the very beginning of the case? We briefed that extensively in the motions in limine, Your Honor. I don't know that that's in our Second Circuit brief, but the law is clear. It's both in this circuit and all of our sister circuits that if a defendant seeks out an advice of an attorney, after they've already commenced the activity that's at issue, the advice of counsel defense doesn't apply in that situation. You're supposed to honestly and in good faith seek out the advice prior to engaging in the activity. But you lost the motion in limine. The judge didn't say you can't have . . . that the defendant couldn't explore this area because all the evidence was about lawyers who came in after the fact. The judge allowed Gertler to testify extensively. What I'm trying to get at is, what is prejudicial to the government about allowing Scully to give his account of that conversation, whatever it is, and then to go after Mr. Scully on cross-examination if what he has to say doesn't stack up to an advice of counsel defense? And then call Mr. Tomeo, if they don't, to go after him as to what exactly he was told, the same way that was done with Gertler. Fair points, Your Honor. And what I think was most troubling to Judge Spat was that it was prejudicial because it just wasn't presented in a fair or reliable way. And these are touchstones of the court . . . Spat just didn't like the idea of somebody testifying about what somebody else told them, which he ultimately realized as a hearsay problem did not exist, but it kind of carried over to his subsequent reasoning, didn't it? Judge, this was at the end of a six-week trial, and the context here is important. Throughout the trial, we had been advised that Mr. Tomeo was going to be called by the defendant to testify on his behalf. He put on his first attorney, and there were serious gaps exposed between Scully's version of events and what Mr. Gertler testified. This was the context in which Mr. Scully got up to say, I'm not calling Tomeo, but Mr. Tomeo told me that everything was totally kosher. That part of the analysis troubled Judge Spat. Why couldn't that be argued to the jury? Defendants often testify to things that the government thinks are false, right? And the testimony is always, by definition, self-serving. And the government is . . . but that doesn't mean he can't say, you know, I didn't shoot this fellow, and Mr. Jones was standing right there with me at the time, and then not call Mr. Jones. The government can call Jones, or the government can cross-examine the defendant. I'm just having trouble understanding why there is some rule that you have to call the other party to the conversation before the defendant can give his version of what occurred. Because in this particular context, and under Judge Spat's 403 analysis, he didn't view this testimony as probative. And I did want to focus, just in case I run out of time, we were talking about e-mails earlier, and I think the first page of the government appendix, there's an e-mail here that's highly illustrative of what was really going on. We focused on the bottom of the e-mail, which says that in Mr. Tomeo's view, most of what was being sold was legal. I'm sorry, I can . . . wait a sec. First page, GA1. The bottom line of the e-mail, bottom line of the first page, he says that he advised the FDA that most of what was being sold was legal. So that's hugely problematic in and of itself. Great stuff for cross-examination. I agree, Judge, but the top part I do want to focus on, if I may, this is why this was not probative, this is why this testimony was cumulative, and this is why Judge Spat, among other reasons, decided to preclude it under 403. If I'm mistaken, please advise me, but the only product which I recall we discussed prior to this spring was Botox. This is in 2012, well after Mr. Scully had engaged in sales of all kinds of products, including biologic chemotherapy drugs. But he had a problem with one of the doctors not accepting what he was selling, and he needed a legal opinion to make sure that what he was doing was legal? That's correct, Your Honor, but he did not thereafter discuss any of the subsequent drugs that he sold with Mr. Tameo, and this is from Mr. Tameo's own mouth. He never consulted or advised him on the plethora of drugs that he sold after Botox. So what probative value is that? He went on his way selling all these different drugs and never spoke to Mr. Tameo about them. And then there's one other thing in this letter. The only written advice you received came from Thaler and Gertler. So they can say that Mr. Tameo was involved throughout, and they can say that he was his personal attorney and he was intimately involved. That's not the reality. We never were able to get our hands on Tameo's time records, but Tameo was a bit player compared to Mr. Gertler. The evidence at trial was that Mr. Gertler was day-to-day involved. He provided written opinion letters. He provided advice on a regular basis, and Mr. Tameo Why isn't this all stuff that should have gone to the jury? You could have put that e-mail in, for example, if you didn't have the fortitude to call Mr. Tameo to the stand without having an interview with him, which I assume he would not give you in advance. You could have put in that e-mail, which says sort of what you just said. It seems to suggest that Mr. Tameo didn't. This is a bit of a CYA from Mr. Tameo, isn't it? You never really told me everything. The only written advice you got was from Gertler, and you could have put that into evidence. You could also have pointed out, if the other side had put in these documents that they're so proud of, attached is a draft statement of facts for the opinion letter. Oh, attached? It ain't attached. The opinion letter isn't there. Maybe is that because the opinion letter may have said everything is hunky-dory, but might have laid out, here's what you told me, and on the basis of that, I conclude that everything is hunky-dory. All that could be argued to the jury. Why is it somehow prejudicial in a sense that would preclude the testimony to say, well, if it was all played out, we would have won because this is all kind of bogus. Why didn't you play it out? Your Honor, I have to be candid with you. We could have called Mr. Tameo. They could have called Mr. Tameo. They had a burden of production with respect to this defense, and pursuant to that burden, they had to convince the jurors that they received advice that met the standards for advice of counsel. Well, wait, wait, wait. When you say they had a burden of production, it doesn't mean you have to convince the jurors. A burden of production means you have to put in sufficient evidence to persuade the judge that this is a topic that needs to be instructed about and that can be litigated at the trial. The burden of proof with respect to fraudulent intent remains with the government the whole time. You're right, Judge. I stand corrected. They had the burden to put forward evidence on this defense. Which they did, the judge said, and that's why Gertler was allowed to testify, right? Gertler was allowed. The judge was consistent throughout. He said, if we're going to hear what attorneys said, I want that testimony to be accompanied by the declarant. And I just— Is that a rule? Is there any legal authority that says it's a rule that if you're going to present an advice of counsel defense, you have to produce the lawyer to testify. It's not enough for you to testify, at least in circumstances where the lawyer is alive and kicking and available to testify. I'm not aware of any such rule, Your Honor. But I do want, in my remaining time, just to state that under 403, Awadallah from 2006, this court said so long as the district court judge conscientiously balances the relevant factors here, there can be no doubt whatsoever that Judge Spat conscientiously balanced the factors here. He gave enormous amounts of thought to this ruling. He wrote about it at length in his post-trial, a 66-page post-trial decision that gives exactly what his thinking was. He was the trial judge. He was sitting there for six weeks. He heard all of the evidence. He gave this a lot of thought. If it's conscientiously balanced, the standard before this court is that the ruling must be arbitrary or irrational. I press upon you, I don't think that this ruling was arbitrary or irrational, given the full mosaic of facts that Judge Spat had before him at the time he made it. Thank you. You're welcome, Your Honor. Thank you very much. We have Mr. Resnick, who reserved two minutes for rebuttal. Thank you, Your Honor. In rebuttal, Your Honor, first, Judge Kogan, thank you, pointed out the document I was looking to identify at A397 and A396 regarding Mr. Tamayo providing research back in 2009 on this issue. The idea that Mr. Tamayo, based on that casual email, is doing a CYA, I think is perceptive. The document I pointed out to the court before at A439, which is the letter to Sierra Nevada Cancer Center. Again, this is not Botox. These are oncology drugs that are being addressed. But, Your Honors, what is important here is that Judge Spat's analysis here, that a defendant is so inherently untrustworthy that he cannot be allowed to testify to state-of-mind evidence without a corroborating witness, is unconstitutional. That used to be what the common law said in the 19th century and the early 20th century, that defendants didn't have a right to testify at their own trial because they had such an interest in its outcome. That way of thinking was overborne by constitutional analysis, realizing that the Fifth and Sixth Amendments of the United States Constitution give a defendant a fundamental right to testify to this. That's where we see cases like Ferguson v. Georgia and Brock v. Arkansas, saying it is the defendant's right to get up. He's available to be cross-examined. The rule of incompetency was replaced by the rule of competency. Mr. Scully was defending his case. He was charged with 75 felony counts. The government put up 40 witnesses. He got on his defense based on his advice of counsel, his good-faith advice of counsel, something which everybody recognizes now. He was absolutely entitled to put forward. It was not hearsay. Judge Spat struggled with that. After that was pointed out, he came up with the 403 argument. But the government was never prejudiced. They've offered no prejudice in their briefs. They've offered and shown no prejudice in their oral argument. The cumulative argument is a post hoc effort to salvage this. But at its fundamental core here is a violation of the rights of a defendant to get up and testify and say competently what his advice of counsel evidence was. He could have been cross-examined. He was cross-examined for days as to his reliance on his other lawyer. As to, you know, the indicia of reliability, we had Mr. Gertler testifying, you know, as to advice that was given to him and the fact that the lawyers believed that this was absolutely lawful to do. Again, not offered because that's the truth, but because that impacted Mr. Scully's mind. He was prevented from putting in an incredibly important piece of his testimony from his personal lawyer who had FDA experience, who was a former assistant U.S. attorney, who the evidence would have shown. And just to be clear, the proffer did not include the draft opinion that was purportedly attached to that e-mail that you cited to us. It just attaches A397, which is the facts. Okay. Yeah. But again, shows, right, and the actual memo that used these facts was admitted into evidence under the letterhead of Mr. Gertler's firm. So this is showing. So this relates to the, so 397, the statement of facts in 397 matches the opinion letter of Gertler. Correct. Correct. So again, and the idea that the government would be able to argue to the jury that Mr. Gertler was incompetent to give this advice because he didn't have the relevant experience left aside the fact that everybody knew that there was an FDA experienced attorney who was providing advice to Mr. Scully as well, and he was prevented from the chance to do that. Forty witnesses, we called two, and the testimony that he was going to give, which was fully competent, not hearsay, not unduly prejudicial, not cumulative, was kept out. And that's why, Your Honors, Mr. Scully deserves to have his conviction vacated, and he's entitled to have a new trial because his constitutional rights here were violated. Thank you. Thank you. Thank you both. We will reserve decision.